IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CV-633-BO

| | |
|---|---|
| STATE OF NORTH CAROLINA, by and through its agency, the NORTH CAROLINA DEPARTMENT OF ADMINISTRATION,<br>    Plaintiff,<br><br>v.<br><br>ALCOA POWER GENERATING, INC.,<br>    Defendant. | **ORDER** |

This matter is before the Court on defendant's second motion for summary judgment. A hearing was held before the undersigned on August 27, 2015, in Raleigh, North Carolina, and the matter is ripe for ruling. For the reasons stated herein, defendant's motion is granted.

## BACKGROUND

At the outset, the Court incorporates by reference the background laid out in its earlier orders on summary judgment [DE 142] and making findings of fact and conclusions of law [DE 177]. Beginning in 1893, the North Carolina General Assembly approved several Acts incorporating companies to develop hydroelectric power within the state. [DE 90–11 to 90–14]. These Acts granted the companies, which are either Alcoa's corporate predecessors or predecessors in title, the ability to privately purchase or condemn land in order to construct hydroelectric projects. The Acts authorized construction of dams on the Yadkin River, "vested" ungranted land in Alcoa and its predecessors, and repealed all inconsistent laws. [*Id.*] The State asserts that it took this action with the "understanding and expectation that Alcoa and its Predecessors could and would use the Yadkin River and its bed to develop industry in this part of the State, thus creating and thereafter maintaining large numbers of high quality jobs for people

living in this region." Compl. ¶ 13. [DE 1–1]. Neither in these Acts nor anywhere else, however, was this "understanding" memorialized, though Alcoa operated an aluminum smelting plant powered by the Yadkin River in Badin, North Carolina from 1916 to 2010. Alcoa Badin Works, *available at* http://www.alcoa.com/locations/usa_badin/en/home.aspl; Compl. ¶ 16 [DE 1–1].

In the early 1900s, Alcoa began acquiring title to land to develop a hydroelectric project (the Project) using the water of the Relevant Segment of the Yadkin River. Ellis Decl. ¶ 7 [DE 91–1], Barham Tr. Test. [DE 181 at 310:3–11]. The last of the title transactions occurred in 1960, when Alcoa purchased and recorded the deed for the last parcel of land necessary to form the Tuckertown Dam reservoir. Gallimore Decl. ¶ 8 n. 2 [DE 100–2]. Alcoa presently has deeds that encompass 99% of the land within the Relevant Segment. *Id.*; *see also* Ribelin Rept. [DE 86–9]. Today, the Project encompasses the entire Relevant Segment and includes four dams: from north to south, High Rock, Tuckertown, Narrows, and Falls. The State does not dispute that Alcoa owns title to the land surrounding the Relevant Segment and underneath the portions of the Relevant Segment now flooded by operation of the dams.

In 1937, Alcoa filed a declaration of its intent to construct the Tuckertown dam, which it believed would impound the last untapped power resource within the Relevant Segment, with the Federal Power Commission (FPC). The other three dams were constructed and opened prior to the enactment of the Federal Power Act. Ellis Decl. ¶ 7 [DE 91–1]. In the administrative proceedings, the North Carolina Attorney General stated that "grants have been and may be made up and down the [Yadkin River], including the area affected by this project to the bed of the stream." 1937 FPC Hearing Proceedings [DE 89–3]. The dam was not constructed at that time, but Alcoa again filed an application for a license from the FPC in 1956. As part of the licensing process, Alcoa publicly stated that it owned "title to all the land and appurtenant water

2

rights" for the High Rock, Narrows and Falls projects and owned "title to approximately 60 per cent of the land and water rights" for the Tuckertown project. 1956 FPC License Appl. [DE 90-3]. It also prepared a document listing every conveyance of fee simple ownership of the riverbed and a survey identifying the location on a map of each conveyance. *Id.* The FPC issued a 50-year license in 1958, which gave Alcoa permission to operate the dams as part of the Project. The Tuckertown dam was constructed and opened in 1962. Ellis Decl. ¶ 7 [DE 91-1].

Since 1958, Alcoa has paid property taxes to five counties for the riverbed, impounded the water and flooded the surrounding areas, and has operated and maintained the dams and the surrounding land. *Id.* at ¶¶ 9-13; *see also* Barham Tr. Test. DE 181, 322:9-13]. It has spent over $175 million on the Project and has flooded the riverbed to create reservoirs. Ellis Decl. ¶ 11 [DE 91-1]. It created and implements a Shoreline Management Plan that regulates the terms and conditions of property ownership around and use of the impounded waters and states that the Project lands are privately owned. Alcoa has posted "no trespassing" signs and has excluded people from the riverbed. *Id.* at ¶¶ 18-19; *see also* Barham Tr. Test. [DE 181, 319:16-20, 322:17-18]; Shoreline Management Plan [DE 91-2]. The North Carolina Wildlife Resources Commission has marked the Relevant Segment as "private property," although it does manage the area. Thompson Dep. 42:19-25, 43:1-6 [DE 192-6]. In 1956 and 2010, the State paid Alcoa or its predecessor in title for the right to cross the bed of the Yadkin River within the Relevant Segment. 1956 Right of Way Agreement [DE 90-7]; 2010 Deed of Easement [DE 90-8]. In 2006, Alcoa filed an application to renew its license with the Federal Energy Regulatory Commission (FERC). The State has admitted that the 2006 application put it on notice of Alcoa's claims to ownership of the riverbed and that its current interest in the riverbed is non-possessory. Compl. ¶ 148. [DE 1-1].

3

The State did not, however, file suit upon learning that Alcoa claimed ownership of the riverbed in 2006, but instead waited until after Alcoa's 2010 decision to close the Badin aluminum smelting plant. *Id.* at ¶ 22. Following its closure, Alcoa moved its aluminum smelting operations overseas, thereby removing jobs from North Carolina, though it continued to operate the dams and sell the electricity on the wholesale, out-of-state market. [*Id.* at ¶ 21–22]. Following Alcoa's continued claims of ownership of the subject property, the State filed this lawsuit in Wake County Superior Court, approximately seven years after it first learned of Alcoa's ownership claims. *See, e.g.,* Carraway Aff. [DE 60].

The Court held a bench trial in April 2015 solely on the issue of navigability of the Relevant Segment. Following trial, the Court ruled that the Relevant Segment was not navigable at statehood. Accordingly, the ownership of the riverbed is determined by ordinary North Carolina real property laws. As the Court noted in an earlier order, North Carolina law vests a presumption of title in the State in suits for land title to which the State is a party. N.C. Gen. Stat § 146–79. Accordingly, the burden is on Alcoa to demonstrate that it has valid title. Following the Court's ruling on navigability, the parties were permitted to submit renewed motions for summary judgment, and Alcoa moved for summary judgment on three separate grounds, arguing that it can prove valid title via North Carolina's Real Property Marketable Record Title Act (MTA), adverse possession, and the equitable doctrine of laches. The State opposes Alcoa's motion.

## DISCUSSION

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

4

(1986); *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001). An issue is "genuine" if a reasonable jury, based on the evidence, could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Cox*, 249 F.3d at 299. The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322–23. Once a motion for summary judgment is properly made and supported, the non-moving party bears the burden of production of evidence that creates an issue of material fact on an element essential to his case and on which he will bear the burden of proof at trial. *Id.* at 323. A non-movant "may not rest upon mere allegations or denials," but rather must demonstrate that a triable issue of material fact exists. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

I. MARKETABLE TITLE ACT (MTA)

The North Carolina MTA provides that "[a]ny person . . . who, alone or together with his predecessors in title, shall have been vested with any estate in real property of record for 30 years or more, shall have a marketable record title." N.C. Gen. Stat. § 47B–2(a). The MTA further provides that such marketable record title "shall be free and clear of all rights, estates, interests, claims or charges whatsoever, the existence of which depends upon any act, title transaction, event or omission that occurred prior to such 30-year period," and that all such competing rights—including those asserted by the State—shall "be null and void." *Id.* at § 47B–2(c). The MTA explicitly extinguishes all competing claims that depend on acts or events prior to the 30-year period, other than the exceptions enumerated in section 47B–3. *Id.* at 47B–2(c); *Hill v. Taylor*, 174 N.C. App. 415, 420 (2005).

The State does not dispute that Alcoa has marketable title to roughly 99% of the Relevant Segment. It instead argues that the MTA does not apply against the State. By its plain terms,

however, the MTA provides that all rights asserted by a person, "whether such person is natural or corporate, or is private or <u>governmental</u>, are hereby declared to be null and void" once marketable record title is shown. N.C. Gen. Stat. § 47B–2(c) (emphasis added); *see also id.* at § 47B–8(1) (defining "person as "private or governmental, including the State and any political subdivision or agency thereof."). The MTA does not contain any exception for rights, titles, or interests of the State, although it does exclude certain "[r]ights, titles, or interests of the United States." *Id.* at 47B–3(8). It provides that its terms should be "liberally construed" to effect its purpose of allowing parties "to rely on a record chain of title of 30 years . . ., subject only to such limitations as appear in G.S. 47B–3." N.C. Gen. Stat. § 47B–9. Moreover, *Taylor v. Johnston*, 289 N.C. 690 (1976), on which the State relies, applied the MTA against the North Carolina Wildlife Resources Commission (WRC), ruling in the agency's favor because the agency satisfied the MTA's exception for persons in "actual and open possession" of the property. *Id.* at 711. The court's reliance on an exception necessarily means that the MTA applied against the State; if it did not, there would be no need for the court to apply an exception thereto. It is clear to this Court that the MTA applies against the State.

It likewise is clear that the open possession exception invoked by the WRC in *Taylor* does not apply here. At the outset, the State has conceded that its interest in the bed of the Relevant Segment is "presently non-possessory." State's Motion for Summary Judgment at 3 [DE 92]; *see Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir. 1989) ("[t]he general rule is that 'a party is bound by the admissions of his pleadings.'"). Additionally, the WRC's regulatory authority to patrol and maintain parts of Alcoa's property does not constitute possession, much less the type of "present, actual and open possession" required by the MTA. N.C. Gen. Stat. § 47B–3(3). It is virtually axiomatic that the WRC routinely patrols public and private land. N.C.

6

Gen. Stat § 113–305. Were the Court to adopt the State's argument, the WRC's regulatory authority would cloud title to any private property the agency patrolled. Yet, as Alcoa points out, the State does not suggest that it has a claim to any of the non-riverbed submerged land the WRC regulates, which is undisputedly private property. Moreover, the court in *Taylor* relied on discrete actions taken by the WRC, including posting signs, constructing dikes, erecting pumping stations, and having "employees who regularly maintained the improvements," as evidence of actual, open possession, rather than the WRC's regulatory control. 289 N.C. at 711. Here, it is clear that Alcoa, not the State, took actions such as posting signs, making improvements, and requiring licenses and permits to access the property at issue in this suit. Ellis Decl. ¶¶ 9, 12–18 [DE 91–1]. Accordingly, the Court finds that the open possession exception to the MTA does not apply.

At argument, the State made much of the fact that application of the MTA would create "competing prima facie cases," because section 146–79 of the North Carolina General Statutes vests a prima facie case in the State in any suit for land title to which the State is a party, while the MTA vests a prima facie case in any party with marketable record title. The State's argument misses the mark. Section 146–79 does not require the State to make any showing whatsoever in order to obtain its prima facie case, and provides that the State has title "until the other party shall show that he has a good and valid title to such lands in himself." It follows logically, therefore, that any evidence of valid title would outweigh the presumption in favor of the State. Moreover, as discussed *supra*, the MTA expressly applies against the State. In sum, the MTA is a valid method by which Alcoa can demonstrate its title. The report of Norman Ribelin, declaration of Kim Gallimore, and supporting deeds and title opinions clearly demonstrate that the MTA vests Alcoa with valid title to 99% of the Relevant Segment. Ribelin Rept. [DE 86–9];

7

Gallimore Decl. [DE 100–2 to DE 107]. Therefore, Alcoa's motion for summary judgment on the MTA is granted.

II. ADVERSE POSSESSION

Alcoa also has title to the Relevant Segment—including the 1% of riverbed not covered by the MTA—through adverse possession.

The State argues that the Relevant Segment may not be acquired by adverse possession because it is subject to public trust rights. N.C. Gen Stat. § 1–45.1. That is only true, however, where "[t]itle to real property [is] held by the State." *Id*. The prohibition cannot apply where, as here, the State has not demonstrated that it has title to the real property at issue. Though the State argues that it has title to the land <u>because</u> the land is imbued with public trust rights, the State does not automatically obtain title to all land subject to public trust rights. It is clear under North Carolina law that riverbeds that are subject to public trust rights can be privately owned. *State v. Eason*, insuff, 790–91 (1894) (holding that ownership of beds of streams used by small boats "but insufficient for seagoing vessels" may be granted or pass by deed); *Gwathmey v. State*, 342 N.C. 287, 290–91 (1995) (stipulating that plaintiffs could establish title and deciding question of whether title was taken free of public trust rights); *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215 (2012) ("With respect to public highways, as the name suggests, the public also retained the right of water passage; but title to the riverbed and soil, as a general matter, was held in private ownership."). Here, the State has never proven that it has valid title to the Relevant Segment, but instead argues that because Alcoa's title is invalid, title defaults to the State. Because the State has not demonstrated that it has title to the Relevant Segment, the prohibition laid out in section 1–45.1 does not apply. Title, therefore, can be acquired by adverse possession.

"To acquire title to land by adverse possession, the claimant must show actual, open, hostile, exclusive, and continuous possession of the land claimed for the prescriptive period . . . under known and visible lines and boundaries." *Merrick v. Peterson*, 143 N.C. App. 656, 663 (2001). The prescriptive period is either 30 years or 21 years under color of title. N.C. Gen. Stat § 1–35. The Court previously denied Alcoa's motion for summary judgment because the issue of navigability impacted whether Alcoa could adversely possess the Relevant Segment. Now that the Court has concluded that the Relevant Segment is not navigable, Alcoa may prove its title through adverse possession. *Id.* (rending adverse possession available against the State); N.C. Gen. Stat. § 145–68 (rendering §1–35 applicable to submerged lands). The State challenges only hostility and exclusive possession. Nevertheless, the Court will consider each element in turn.

A. Actual Possession

Actual possession means physical possession, control and use of the land as if it were one's own property. *See, e.g., Taylor v. Johnston*, 289 N.C. 690, 709 (1976) (quoting *Locklear v. Savage*, 1569 N.C. 236 (1912). Alcoa has constructed dams, flooded the riverbed, operated the Project, and monitored access and use of the property by license and permit. *Id.* at 710 (finding actual possession where dikes, pumping stations, and equipment sheds were constructed on property). The last dam was constructed in 1962. Ellis Decl. ¶ 7 [DE 91–1]. The State does not dispute Alcoa's actual possession of the Relevant Segment, and the Court finds that it has been in actual possession since at least 1962.

B. Open Possession

"Open possession" is "of such character that the true owner may have notice of the claim . . . ." *Dulin v. Faires*, 266 N.C. 257, 260 (1966); *see also McManus v. Kluttz*, 165 N.C. App. 564, 573 (2004). "[W]orking activities . . . create[] sufficiently open and notorious possession if

9

they are kept up with such frequency and regularity as to give notice to the public that the party performing the work is claiming ownership of the land." *Id.* It follows, therefore, that performing regular work, building structures, monitoring access, and paying property taxes are all acts that establish that a party's possession is open and notorious. *Id.*; *Corbett v. Corbett*, 249 N.C. 585, 590 (1959) (paying taxes considered evidence of open possession); *Lancaster v. Maple Street Homeowners Ass'n, Inc.*, 156 N.C. App.429, 436 (2003) (performing yard work, installing posts, and asking strangers to leave property considered sufficient evidence of actual, open possession).

Here, Alcoa built four dams between 1917 and 1962, created reservoirs, and worked on and maintained the facilities. Ellis Decl. ¶¶ 7–8, 12–13 [DE 91–1]. It posted signs at public access points, restricted access, and required anyone seeking to enter the riverbed to obtain easements or approvals. *Id.* at ¶ 14–15; Public Safety Plan for Yadkin Project [DE 91–2]. It recorded deeds to property and paid taxes on the riverbed. Ellis Decl. ¶ 10 [DE 91–1]. It documented its claim to ownership in the 1956 FPC hearings and again in the 2006 FERC relicensing. 1956 FPC License Appl. [DE 90–3]; 2006 FERC License Application [DE 189–5]. The State rightly does not dispute Alcoa's open possession, because these actions are sufficient to demonstrate open possession since at least 1962, when the last dam was constructed.

C. Hostility

A hostile use is "simply a use of such nature and exercised under such circumstances as to manifest and give notice that the use is being made under claim of right." *Daniel v. Wray*, 158 N.C. App. 161 (2003) (quoting *Dulin v. Faires*, 266 N.C. 267, 261 (1966). The hostility element of adverse possession requires "only that the one in possession of the lands claims the exclusive right thereto." *State v. Brooks*, 275 N.C. 175, 180 (1969). Although a grant of permission to use the land typically defeats hostility, it will not defeat hostility where the possessor "takes some

affirmative step to put the true owner on notice that the possessor's use of the land remains hostile." *Jones v. Miles*, 189 N.C. App. 289, 294 (2008).

Alcoa relies in part on its representations in 1956 Federal Power Commission (FPC) proceedings as evidence that it has publicly claimed ownership since at least that date. The FPC proceedings did not directly concern ownership of the Relevant Segment; however, Alcoa publicly stated therein that it "heretofore has acquired and now owns title to all the land and appurtenant water rights for the existing High Rock, Narrows, and Falls Developments and has acquired and now holds title to approximately 60 per cent of the land and water rights for the proposed Tuckertown Development." 1956 FPC License Appl. [DE 90–3].

Moreover, Alcoa represented to the Federal Energy Regulatory Commission (FERC) that it owns all of the real property necessary to operate the Project in 2006. Compl. ¶ 33 [DE 1–1]; Pretrial Order at 7 [DE 148]. Alcoa's 2006 FERC application reiterated the same ownership claims as its 1956 FPC application. The State's complaint concedes that the 2006 application put it on notice of Alcoa's ownership claim. Compl. ¶ 33 [DE 1–1]. Accordingly, the State's concession is an implicit concession that the 1956 application put it on notice as well. The most obvious evidence of Alcoa's claim of ownership, however, is the detailed documentation submitted by Alcoa's predecessor in the 1956 FPC application that listed every title transaction and deed supporting Alcoa's claim to the Project lands and a map placing those deeds on the ground. Ribelin Rept. Ex. A [DE 86–9 to 86–10]. Moreover, a number of the State's own witnesses, including Sergeants Anthony Sharum and John Thompson of the North Carolina Wildlife Resources Commission, conceded that the State has understood these actions and other statements by Alcoa as asserting ownership of the bed of the Relevant Segment. Sharum Dep.

[DE 192–5]; Thompson Dep. [DE 192–6]. In sum, it is clear that the State was on notice, both specifically and generally, that Alcoa claimed ownership rights to the property.[1]

The State argues that Alcoa has always operated dams on the Yadkin River with the State's permission and consent, thereby defeating Alcoa's adverse possession claim. In support of this claim, the State relies on the incorporating acts of a number of power companies that are predecessors in defendant's chain of title or corporate predecessors of defendant. *An Act to Incorporate the Yadkin River Power Company*, 1897 S.L. Ch. 236 [DE 90–14]; *An Act to Incorporate the North Carolina Electrical Power Company*, 1899 S.L. Ch. 151 [DE 90–13]; *An Act to Incorporate the Whitney Reduction Company*, 1901 S.L. Ch. 6 [DE 90–12]; *An Act to Incorporate the Tallahassee Power Company*, 1905 S.L. Ch. 122 [DE 90–11]. Rather than grant Alcoa permission to use state-owned land, however, inspection of the Acts reveals that the State gave Alcoa's predecessors the right to condemn private property if the owner did not want to sell. *See, e.g.*, 1897 S.L. Ch. 236, § 8 [DE 90–14], 1905 S.L. Ch. 6, § 6 [DE 90–11]. Additionally, the 1897 Act vested title in Alcoa to any lands that had not been previously granted to a private party. 1897 S.L. Ch. 236, § 10 [DE 90–14] ("All land not heretofore granted to any person, lying within the locations made by the company for its works, shall vest in the said company as soon as the works are definitely laid out through or upon it, and any grant of said land thereafter shall be void."). The State, therefore, cannot rely on these Acts to demonstrate permissive use, as they do not grant Alcoa permission to use the land in question, but instead grant Alcoa the right to acquire title to property.

---

[1] The Court previously dismissed Alcoa's argument that the State waived its right to bring this suit via the State's alleged adoption of Alcoa's statements in the 1937 and 1956 FPC proceedings. [DE 142 at 7]. The Court notes that the instant finding as to hostility is premised not on any representations by the State, but instead on representations by Alcoa in the aforementioned proceedings.

### D. Exclusivity

Exclusive use "is denoted by the exercise of acts of dominion over the land, in making the ordinary use . . ., such acts to be so repeated as to show that they are done in the character of owner." *Rushing v. Aldridge*, 214 N.C. App. 23, 34 (2011) (quotation and citation omitted). A party is not "compelled to bar all other persons at all times from traversing the property in dispute" to show exclusivity. *Warmack v. Cooke*, 71 N.C. App. 548, 553 (1984). Exclusivity requires only that "other people . . . not make similar use of the land during the required statutory period." *Rushing*, 214 N.C. App. at 31 (quotation and citation omitted).

Alcoa is the only entity that built dams, flooded the riverbed, maintained the dams and reservoirs, and paid taxes on the property encompassing the Relevant Segment. This demonstrates exclusive possession. The State argues that public use of the reservoirs and the WRC's regulation thereof defeats exclusivity. However, the fact that Alcoa grants permission to use property confirms, rather than negates, private ownership. *See, e.g, Rushing*, 214 N.C. App. at 34 (finding claimant's grant of permission to neighbors to use disputed land demonstrated "ordinary use of the land in the character of a true owner"). Moreover, the WRC's regulation and patrol cannot defeat exclusivity because it is not similar to Alcoa's use of the land. While Alcoa has improved the property, paid taxes on it, and regulated use thereof, the WRC merely patrols the land. It is ludicrous to think that the WRC's regulation of the land at issue would defeat exclusivity. The State's arguments therefore fail, and the Court finds that Alcoa has demonstrated exclusive possession since at least 1960.

### D. Continuity

Continuity requires a party to show that "actual use and occupation has extended over the required period and that during it, the claimant has, from time to time, continuously subjected the

13

land to its susceptible use." *McManus v. Kluttz*, 165 N.C. App. 564, 575 (2004). Alcoa has held the FERC license, operated the Project, constructed and maintained the dams and reservoirs since at least 1962. The State has not disputed this, thus the Court finds that Alcoa's possession has been continuous since that date.

E. <u>Known and Visible Boundaries</u>

A party can establish that its possession has been under "known and visible lines and boundaries" by "appris[ing] the true owner and the world of the extent of the possession claimed." *Id.* at 570. Alcoa has possessed the entire Project area, including the reservoirs and dams, since at least 1962. Although the State argues that the boundaries of the riverbed are not readily identifiable or visible, Alcoa's uncontested possession of the entire Project area necessarily encompasses possession of the riverbed of the Relevant Segment. Additionally, Alcoa possessed under color of title the riverbed through recorded deeds. *See id.* at 572 ("[P]laintiff can gain title to the disputed property even without known and visible boundaries on the ground so long as she can establish the elements of adverse possession within the boundaries identified by her deed."). Alcoa's actual possession and record title confirm that its possession is under "known and visible boundaries" that encompass the bed of the Relevant Segment.

In sum, Alcoa has satisfied all of the elements of adverse possession since at least 1962, thus its motion for summary judgment on adverse possession is granted.

III.   LACHES

As the Court has determined that summary judgment in defendant's favor is appropriate on the bases of the MTA and adverse possession, it declines to address Alcoa's arguments as to laches.

## CONCLUSION

It is impossible not to notice the timing of this lawsuit. The State did not file suit immediately upon learning that Alcoa claimed ownership of the property. Instead, it waited over seven years, until after Alcoa closed the Baden Works aluminum smelting plant, to file suit. It appears to the Court that as long as Alcoa's use of the Relevant Segment satisfied the State, the State was content not to challenge ownership. It was only when the State disapproved of the use Alcoa made of the Relevant Segment that the State attempted to assert its ownership interest. Unfortunately for the State, hindsight is often better than foresight. When the State originally granted Alcoa the right to obtain the property necessary for construction of the Project, no one provided for the fact that Alcoa's use of the property might change. While the Court is not unsympathetic to the State's concerns, it is abundantly clear that the State has no one to blame here but itself. The evidence, even viewed in the light most favorable to the State, overwhelmingly demonstrates that Alcoa has title to the bed of the Relevant Segment.

Therefore, defendant's motion for summary judgment [DE 183] is GRANTED on the bases of the Marketable Title Act and adverse possession. Defendant's motion in limine [DE 168] is DENIED AS MOOT. The Clerk of Court is DIRECTED to enter judgment accordingly and to close the case.

SO ORDERED, this 28 day of September, 2015.

_Terrence W. Boyle_
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE